**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>APPLICATION OF INTERNATIONAL MINERAL RESOURCES B.V. FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782<br><br>Applicant. | Case No. _____ |

**DECLARATION OF JONATHAN D. COGAN**

# EXHIBIT W

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:

APPLICATION OF INTERNATIONAL MINERAL
RESOURCES, B.V. FOR AN ORDER TO TAKE
DISCOVERY PURSUANT TO 28 U.S.C. § 1782

Jan Luijkenstraat 68
Amsterdam, 1071CS
Netherlands,

                Applicant.

1:14-MC-00340
JUDGE KESSLER
Assigned: April 3, 2014
Miscellaneous

## AFFIDAVIT OF RINAT AKHMETSHIN

**CITY OF WASHINGTON** )
                         ) ss:
**DISTRICT OF COLUMBIA** )

**RINAT AKHMETSHIN**, being first duly sworn, deposes and states:

1. My name is Rinat Akhmetshin and I am the individual that Applicant International Mineral Resources ("IMR") seeks to take discovery from under the pretext of this 28 U.S.C. § 1782 proceeding. I make this Affidavit to oppose IMR's application.

2. My only involvement with the litigation and arbitrations enumerated in the "*Ex Parte* Application For An Order Under 28 U.S.C. § 1782 . . ." dated April 3, 2014 ("Application") was as a retained consulting expert for the law firm Salisbury & Ryan LLP counsel for the litigant EuroChem Volga-Kaliy ("ECVK") in its Dutch litigation against IMR. Salisbury & Ryan is also counsel to ECVK in the Paris arbitration and Zurich arbitration against IMR's subsidiary Shaft Sinkers (Pty) Ltd, a South African company. My services were utilized with respect to all three proceedings. (A copy of my Salisbury & Ryan engagement letter is attached as Exhibit A).

3. I was hired specifically to assist Salisbury & Ryan as a consulting expert in connection with litigation brought by its client ECVK against IMR and Shaft Sinkers. Specifically, I was engaged to research and consult with respect to the unique legal, social, economic, and political issues that arise in Eurasia relevant to this litigation. That was important in these proceedings because two of the principals of IMR are nationals of Uzbekistan and one is a national of Kyrgyzstan. These three principals (the "Trio") made much of their money from aluminum extraction in Kazakhstan, a country with which I have considerable familiarity and expertise.

4. I am also Director and head of the Washington office of the International Eurasian Institute for Economic and Political Research ("IEI"). I founded IEI with others in 1998 to try to help expand democracy and the rule of law in Eurasia. One of the ways that IEI attempts to do so is through an educational program aimed at Western elites to inform them about political and economic conditions in Central Asia and Russia. It is a part of the world about which even the most educated Western citizens know very little. IEI also seeks to bring about democratization in Eurasia with a three-part program that focuses on fostering the development of an independent judiciary, safeguarding the rights of the individual, and promoting free and fair trade as a means of combating institutionalized corruption in Eurasia. There is a lot of work to do.

5. I also provide consulting services beyond IEI. My clients range from private citizens to corporate entities to sovereign governments. For example, I was retained by a national government controlling territory that formerly comprised part of the Soviet Union to assist with American military base relocations. We worked quite closely with the Defense Department, the State Department, and the Department of Justice to locate strategically

significant base locations. Other matters that my private consulting practice has worked on include issues relating to narco-trafficking, drug eradication, and terrorism in Afghanistan and surveillance of undercover agents and suspected undercover agents. I have been told that our efforts have helped save American lives, particularly in theatres such as Afghanistan, and reduced the flow of narcotics originating in Afghanistan worldwide. As a consulting expert, I have been retained by law firms involved with Russian and Central Asian disputes before, including as a consulting expert in *Egiazaryan v. Zalmayev*, a dispute venued in the Southern District of New York. In that matter, my client was seeking to prohibit political asylum in the United States for oligarch Ashot Egiazaryan, a former Duma member, and fund raiser for the Liberal Democratic Party, or LDPR, an anti-American, anti-Semitic Stalinist rump party. Mr. Egiazaryan was indicted, stripped of his legislative immunity, and fled to the United States.

6. It was in this capacity as a private consultant that I was retained by Salisbury & Ryan with respect to ECVK's issues with IMR and Shaft Sinkers. All of my involvement and activities were done at the request of attorneys at Salisbury & Ryan, led by Patrick Salisbury. In my role, I assisted the firm in doing due diligence research on IMR, Shaft Sinkers, and the Trio, and consulted with respect to legal, social, economic, and political realities in that part of the world. In the course of my engagement, I also developed and proposed to ECVK a strategic communications strategy relevant to the Dutch action. That proposal was rejected, and my engagement with Salisbury & Ryan terminated soon thereafter.

7. I am not sure what IMR means on page five of their Application when they alleged I was hired to give ECVK "an unfair advantage in the arbitrations and litigation." I was hired by Salisbury & Ryan. I assumed they hired me because they thought it would be helpful. I have not yet been hired to provide a client a disadvantage. Nor do I understand what

3

is unfair about hiring a consulting expert. That is one of the ways I make my living. Even Mr. Chodiev's Declaration admits that Salisbury & Ryan retained my services "to assist EuroChem against IMR in the Dutch action." (Chodiev Dec. at ¶ 11).

8.   I am not a computer specialist and I am not capable of "hacking."

9.   My own computer was stolen in the Berlin airport last year. A police report was filed. A copy of the Berlin police report regarding the theft of my computer is attached as Exhibit B.

10.  The vast majority of the research that I did for Salisbury & Ryan was open source research, that is, fact-finding that was available in the public domain. For example, there is a NGO entity based in London known as Global Witness (found at www.globalwitness.org) that is financed in part by philanthropist George Soros. Global Witness publishes articles and acts as an information clearinghouse for good corporate governance and individual rights. They have made available substantial amounts of information about IMR and its public twin ENRC. There were also vast amounts of information available in the press. When the British Serious Fraud Office opened its criminal investigation of ENRC in April of 2013, it made headlines in serious newspapers such as the Guardian. ("ENRC: Serious Fraud Office launches criminal investigation," The Guardian, April 25, 2013, copy attached as Ex. C). There were volumes of information published on IMR, ENRC, the Trio, bribery, scandal, and kickbacks in Kazakhstan and Africa. This made my job relatively easy -- just reading the morning newspapers from around the world could bring me new information and insights on my research topics.

11.  As noted elsewhere, ENRC was the publicly listed company of the Trio on the London Stock Exchange that became so bogged in scandal that it was delisted last year. There was even more information publicly available once the ENRC scandal became a *cause*

4

*celebre* in the London press. Indeed, the very nature of the Trio's "economic model" -- extraction of natural resources from the earth -- makes it a paradigm for bribery and private collusion with dictators, autocrats, and other regional strongmen that control that particular patch of earth.

12. During the investigations into ENRC in the spring of 2013, in an apparent effort to defend itself against the charges of corruption in Kazakhstan and Africa, ENRC issued a press release warning of certain electronic security issues. According to the London Telegraph, "a laptop containing staff details including bank account numbers, has mysteriously vanished in a 'domestic burglary,' while ENRC has also suffered 'an intrusion into the group's electronic systems by a third party.'" The obvious import of the announcement was not lost on British authorities or the press: "It was enough to trigger all manner of conspiracy theories, not least that the computer hacking could be used as a convenient excuse if material now went missing relating to alleged corruption in Kazakhstan and Africa." ("Burglary And Computer Hacking Add To Woes At ENRC," The Telegraph, May 23, 2013, copy attached as Ex. D).

13. Not only were private watchdogs such as Global Witness and the London press publishing vast amounts of information about IMR and ENRC, but also once the publicly-held ENRC ship started sinking in 2012 and 2013, various directors, officers, employees, former employees, and disgruntled ENRC associates began leaking company information. The vast amount of material about ENRC that was leaked even became the butt of jokes in the press. According to the London Telegraph one ENRC insider was quoted as saying "ENRC leaks so badly why would anyone even bother to hack it." (See Exhibit D).

14. I have been in several London coffee shops in my life. It is entirely possible that I was overheard talking to a colleague or client in such a location. It is not possible

5

that I was overheard saying that I was turning over documents that I had hacked from an IMR or ENRC computer, because I have never done so, nor do I have the skills to do so. I have not worked on the Salisbury & Ryan matter for almost a year. Contrary to the Application at pages 7 and 8, I certainly had no conversation discussing Salisbury & Ryan matters in January of 2014. I might have mentioned to this relatively new client, an Israeli businessman, that I had done work for that firm in the past in describing to him the nature of my clientele. To the best of my recollection, all of my most recent meals in a London coffee shop were incidental to work I did for this new client, and had nothing at all to do with Salisbury & Ryan, the Dutch litigation, or the Paris or Zurich arbitrations.

15. All of the due diligence and related information that I presented to Salisbury & Ryan was publicly available or made available to me through my personal contacts in Central Asia and Russia. My services with Salisbury & Ryan were terminated on or about May 31, 2013. I am unfamiliar with events or proceedings in any of the European proceedings since that date. I have not had any substantive communications with Salisbury & Ryan since summer or early fall of 2013.

*Rinat Akhmetshin*

Sworn to before me this
1st day of May, 2014

Notary Public

Chang Ho Choi
Notary Public District of Columbia
My Commission Expires 6/14/14

6