UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE APPLICATION OF INTERNATIONAL MINERAL RESOURCES B.V.<br><br>For an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for use in Foreign Proceedings | 15 Misc. 241 (Part I)<br>Case No. 1:15-mc-00241-P1 |

### DECLARATION OF PATRICK P. SALISBURY

Pursuant to 28 U.S.C. § 1746, I, Patrick P. Salisbury, declare under penalty of perjury as follows:

1. I am the senior partner of Salisbury & Ryan, LLP "(S&R"), a New York law firm, and have been a member in good-standing of the Bars of the State of California since 1982, New York since 1993 and the District of Columbia since 1995. I make this declaration in support of my Motion to quash or modify the subpoena dated August 10, 2015 (the "Subpoena"), issued on the *ex parte* application of International Mineral Resources B.V. ("IMR"). I have personal knowledge of the facts stated herein unless indicated otherwise.

2. IMR's application arises out of S&R's retention of Rinat Akhmetshin as a consulting expert in a lawsuit brought by ("ECVK") against IMR in the Netherlands (the "Dutch Action"). My firm also represents ECVK in arbitration proceedings against IMR's subsidiary Shaft Sinkers (Pty) Ltd. ("Shaft Sinkers") in Switzerland (the "Swiss Arbitration") and France (the "ICC Arbitration"), and related proceedings in South Africa and the U.S. District Court for the District of Columbia (the "Washington Case").

3. I categorically deny IMR's allegations that I requested or authorized Mr. Akhmetshin to hack IMR's computers or to engage in a negative publicity campaign against IMR and, to the best of my knowledge and belief, Mr. Akhmetshin was not involved in any alleged hacking or negative publicity as he confirmed in his sworn testimony in the Washington Case.

1

4. Applicant IMR is a private Dutch company owned by three billionaire oligarchs from Kyrgyzstan and Uzbekistan – Alexander Machkevitch, Patokh Chodiev, and Alijan Ibragimov – known as the "Trio" and infamous for their *"business links with organized crime in the former Soviet Union," "fraud, bribery, and corruption," "corruption at subsidiaries," "money laundering and forgery," "tax evasion," "money being siphoned off from the employees' fund," "the audit committee's investigation obstructed," "continual attempts to block the internal inquiry into alleged corruption," "the dismissal of internal investigators and serious threats to officials carrying out the inquiry."*[1]

5. The Trio, and IMR's sister company, Eurasian Natural Resources Corporation ("ENRC"), are also the subject of an investigation announced by the U.K. Serious Fraud Office into their "fraud, bribery and corruption", reportedly joined in by the U.S. Department of Justice.[2] In the midst of that investigation, and following the resignation of all of its independent directors, ENRC was ignominiously delisted from the London Stock Exchange in 2013.[3]

6. Patokh Chodiev, a member of the Trio and IMR's witness in its §1782 proceeding in Washington,[4] is also the subject of an announced criminal investigation in France for bribes paid to senior French government officials to obtain the assistance of the President of France in settling criminal money laundering charges brought against him.[5]

7. In two recent decisions, the UK High Court of Justice publicly castigated the Trio, finding that they had personally committed a fraud on the High Court by submitting false witness statements and giving false testimony to the High Court.[6] Citing *"the manifest dishonesty of the [Trio] and their witnesses,"* their *"severely damaged credibility,"* and their misconduct *"out of the ordinary by way of unreasonableness and impropriety,"* the High Court found that the Trio themselves and their other witnesses *"put a false case forward,"* gave *"false evidence . . . in support of that false case," "have lied"*[7] and were *"not to be believed."*[8]

2

8. Since March 2012, I have been the principal attorney representing ECVK in the Swiss and ICC Arbitrations. On August 21, 2015, the Swiss tribunal[9] issued its final award in the Swiss Arbitration, ruling in ECVK's favor and granting it $112.6 million in damages, $8 million in legal fees, and interest on damages (approximately $20 million currently), for a total award approximately $140 million. After hearing dozens of witnesses and reviewing hundreds of documents in a nearly month-long arbitration hearing in Zurich, the Swiss Tribunal unanimously concluded that IMR's subsidiary had perpetrated a massive fraud against ECVK and bribed ECVK's project manager responsible for overseeing the $350 million shaft-sinking contract.

9. The Swiss Tribunal found that Shaft Sinkers had engaged in a "wrongful conduct (its fraudulent misrepresentations and bribery)" (Swiss Award p. 359 n.63), "false" representations of facts (Swiss Award ¶ 1077), "deliberate" concealment of essential information from ECVK (Swiss Award ¶¶ 1060-61), as well as "the overcharging and the procurement fraud" (Swiss Award ¶ 1340). "The evidence compels the Tribunal to find that [Shaft Sinkers] committed *the tort of deceit*." (Swiss Award ¶¶ 1079, 1083). The Swiss Tribunal also found "*not plausible*"[10] the testimony of IMR's Representative and Shaft Sinkers' CEO Alon Davidov.

10. I am also co-counsel to ECVK in its Dutch Action against IMR, where ECVK is represented by Houthoff Buruma, a leading Dutch law firm. ECVK alleged in the Dutch Action that IMR directed the fraud committed by Shaft Sinkers. The procedural history of that case is described in the legal opinion of Dutch counsel, Marielle Koppenol-Laforce submitted herewith.

11. IMR claimed in its original Section 1782 application filed in the Washington Case that documents supplied by Mr. Akhmetshin were improperly used by ECVK in the Dutch Action. Critically, however, IMR did not — as it could not — point to a single document that was improperly obtained from IMR's files used in the Dutch Action, or the Swiss Arbitration or ICC Arbitrations.

12. In June 2012, S&R retained Mr. Akhmetshin, an expert in Kazakh business and politics with a wide network of connections in those circles as well as in the media, to assist in researching factual information and conducting pre-filing due diligence on IMR, as it had become apparent that the damages sought by ECVK far exceeded Shaft Sinkers' resources..[11] Moreover, it became apparent that ShS' controlling parent, IMR, might also be responsible for the fraud that occurred. At the time S&R did not know, however, the specific organizational structure of the Shaft Sinkers' group. While S&R understood that control of ShS ultimately rested with entities controlled by the Trio who were engaged in extensive business activities in Kazakhstan, we did not know which of their many entities ultimately controlled Shaft Sinkers.

13. Mr. Akhmetshin, now a U.S. citizen residing in Washington D.C., is the CEO and founder of the International Eurasia Institute for Economic and Political Research and provides research for use in litigation in the U.S. and the U.K. involving business disputes with Russian and Kazakhstan entities.

14. S&R engaged Mr. Akhmetshin to research the ownership of Shaft Sinkers, and the business operations of its parent entities (and at the same time, to understand the Trio's relationship to this shareholder). Mr. Akhmetshin is a recognized expert on business and political matters in Kazakhstan, Russia, and other former Soviet countries. In his 2007 book "The Oil and the Glory", a study of the oil and gas industry in the former Soviet Union including Kazakhstan, Steven Levine – a reporter for the Washington Post, New York Times, Wall Street Journal, and Newsweek – described Mr. Akhmetshin as well-connected with "Washington reporters, think tank experts, administration bureaucrats and key political figures" and "armed with inside information" from those sources about Kazakhstan and Russian business and political affairs.[12]

15. S&R and other U.S. and U.K. law firms have engaged Mr. Akhmetshin as an expert in litigation matters involving major transactions in Kazakhstan and Russia. Mr. Akhmetshin has

4

listed a few of these matters in his previous declarations in the Washington Case, including his work for a former Soviet country on a matter involving relocation of U.S. military bases within that country requiring him to work closely with the U.S. Departments of Defense, State and Justice. Washington Case, Dkt. 10-1 ¶ 5.

16. As litigation counsel, S&R had the authority to hire testifying experts and consultants without advance notice to or approval of ECVK. S&R retained Mr. Akhmetshin without any involvement or knowledge of ECVK. ECVK never had any direct involvement with Mr. Akhmetshin and spoke with him only to arrange and then hold a brief meeting in September 2012 where he proposed providing additional strategic communication services, which proposal ECVK rejected.

17. Mr. Akhmetshin was engaged by us, as counsel to ECVK, pursuant to a written engagement agreement dated July 26, 2012.[13] The engagement agreement provides that Mr. Akhmetshin:

> will provide the Client with assistance in the Client's investigation of claims it may have against companies relating to a mining project being built by the Client in Russia which has encountered delays. You will assist in such endeavors by researching and providing information concerning the relevant parties and other requested information. You confirm that all services provided by you will be made in full compliance with all applicable laws of the U.S. and other relevant jurisdictions.

18. At no time did EuroChem or ECVK control or direct Mr. Akhmetshin. Mr. Akhmetshin reported to me and I reported to the CEO and General Counsel of the client. EuroChem's security department had no involvement in, or control over, the litigation, as this was solely the responsibility of EuroChem legal department headed up by its General Counsel Valery Sidnev (formerly with the U.S. law firm Baker Botts L.L.P.)

19. By the time Mr. Akhmetshin was engaged, the Trio and their various business interests had come under massive scrutiny in the U.K. and U.S. for their criminal fraud activities,

resulting in disclosure of substantial information concerning their activities both to governmental regulators and, inevitably, to journalists and others with an interest in exposing the corruption in which they believed members of the Trio and their business interests were engaged. Numerous press articles were issued in major publications in London and New York describing in detail the fraud of which they were accused.

20. Moreover, the independent U.K. directors of ENRC and many senior employees were "fleeing the ship" and offering information to governmental agencies, journalists, and others in an attempt to distance themselves from the wrongdoing and avoid being caught up in the criminal indictments and lawsuits that would inevitably follow. This information quickly began to circulate in London where ENRC was based and was increasingly available through a variety of sources (including journalists and nongovernmental "watchdog" organizations), S&R understood that Mr. Akhmetshin had access to a number of those and other private sources of information concerning IMR and the Trio, and that Akhmetshin could obtain information <u>lawfully</u> from these sources to provide research and analysis relevant to the litigation against IMR. S&R understood and believed then, and has understood and believed since, that Mr. Akhmetshin obtained this information consistent with local law, and not through any unauthorized intrusion into anyone's computer system. Akhmetshin provided information and analysis concerning business relationships and activities that linked Shaft Sinkers, through intermediate entities including IMR, to the Trio, which Mr. Akhmetshin said he received from these legitimate sources.

21. Neither ECVK nor S&R ever initiated any "strategic communications campaign" against Shaft Sinkers or IMR. On a very limited basis, I authorized Mr. Akhmetshin to supply limited information concerning the Dutch litigation to specific journalists or others with an interest in covering ENRC and the Trio, but only under two conditions: (a) that Mr. Akhmetshin believed this would assist his effort to obtain relevant information in exchange, and (b) that the information

he disclosed was already in the public domain (though in some cases, difficult for interested parties to obtain). The only document he was authorized to supply was a copy of the complaint filed by ECVK in the Dutch Court after it was filed.

22. In May 2013, Mr. Chodiev contacted Andrey Melnichenko, then Chairman of EuroChem, the parent company of ECVK, and objected to ECVK's use of Mr. Akhmetshin as an expert here because Mr. Akhmetshin also represented clients unrelated to EuroChem who were IMR's opponents. Mr. Chodiev did not claim that Mr. Akhmetshin had engaged in any improper activities. Mr. Melnichenko then contacted me, asked me who Mr. Akhmetshin was and directed me to terminate his services because of Mr. Chodiev's objections. I met with Mr. Akhmetshin on May 27, 2013 and notified him of the termination of any further services, followed by a written notice to the same effect to him. Mr. Akhmetshin acknowledged his termination in writing on May 29, 2013.

23. Since May 27, 2013 – more than two years ago – Mr. Akhmetshin has not provided further expert services to S&R or ECVK. I had minimal contacts with Mr. Akhmetshin after his termination, mostly to arrange final payment for the consulting services that Mr. Akhmetshin had provided before his termination. On one occasion in the fall of 2013, I called Mr. Akhmetshin to ask him about his concerns over intrusion into his telephone system and theft of his computer that he expressed during his engagement.

24. Mr. Akhmetshin did not meet with me or anyone else acting on ECVK's behalf before or after the coffee shop meeting referred to in IMR's application to discuss that meeting or provide additional information. Indeed, by that time Mr. Akhmetshin had not been involved in the legal matters we were handling for ECVK for about nine months.

25. IMR's claim that Mr. Akhmetshin was hired to hack its computers is ludicrous. I have known Mr. Akhmetshin for about five years and to my knowledge he has no computer hacking

expertise or any staff or outside contacts with such expertise. Moreover, in accordance with our standard practice in international matters of this sort I specifically directed Mr. Akhmetshin that all work he performed be done in full compliance with U.S. and any applicable foreign law exactly as provided in the engagement agreement. He confirmed his understanding of, and agreement to adhere to, that requirement before the engagement began.

26.   I have observed Mr. Akhmetshin's services to other clients and have never seen or heard of his involvement in any improper data gathering such as hacking. He has never told me or to my knowledge any of our clients that he can hack or arrange hacking of any information systems. Rather he told me – and I personally observed – that Mr. Akhmetshin has deep contacts with journalists at major international organizations such as the Wall Street Journal, the London Financial Times and The Guardian based in the U.K., and highly respected Non-Governmental Organizations such as Global Witness,[14] a renowned anti-corruption watchdog group (co-nominated for a Nobel Peace Prize in 2003) based in London funded by George Soros and others to expose international business corruption, international agencies and others through which Mr. Akhmetshin obtains research information.

27.   I believe I know the source of every document provided to me by Mr. Akhmetshin based on what he told me then and confirmed under oath in the Washington Case, and none of these documents were obtained from IMR. Rather, all were obtained from identifiable third party sources outside of IMR.

28.   One of Mr. Akhmetshin's important sources was the former Prime Minister of Kazakhstan, Mr. Kazhegeldin. Mr. Akhmetshin told me that Mr. Kazhegeldin had extensive dealings with the Trio both while Prime Minister of Kazakhstan and in connection with legal actions in which he was involved with the Trio or their companies and he had long worked as a consultant for Mr. Kazhegeldin who was his largest client. He stated that Mr. Kazhegeldin had

collected so much information about the Trio and related entities that he had a searchable database of documents concerning the Trio. I accordingly asked Mr. Akhmetshin if he could learn more from this database, and suggested categories of information for which Mr. Kazhegeldin's associates could search for evidence which would be relevant to our litigation. It is my understanding that Mr. Akhmetshin worked with Mr. Kazhegeldin and his office for a number of months to review and collect information from their files.

29. I have never met or communicated with Scott Horton and cannot recall ever having even heard of him until IMR's application in the Washington Case.

30. Despite IMR's plaintive cries that its subpoena seeks only four categories of discovery, those categories are extremely broad and would include reams of work product – including three years' worth of my extensive work product in all of the related proceedings, and otherwise privileged documents held by me relating to many cases in which IMR, itself, is not a party. Privilege issues under U.S. and foreign law[15] would require a massive and exceedingly expensive privilege log and inevitably lead to privilege disagreements and further proceedings here and abroad. Moreover, the requested documents include privileged materials of clients *unrelated* to ECVK.

31. The Subpoena calls for the disclosure of many hundreds of thousands of pages of documents, all of which are subject to confidentiality orders and many of which are privileged under U.S., Swiss, Russian, South African or other privileges and where, in the Swiss Arbitration the Tribunal has specifically denied IMR's request for access to those materials.

32. In the Washington Case and this application IMR attempts to make much of a mysterious "thumb" drive ("the Mysterious Thumb Drive") that some unknown, anonymous source supposedly delivered without explanation to some unnamed person working for IMR at a hotel in London. First, creating false documents – even an entire fake computer system – is a tactic[16]

notoriously used by the Trio in the past to try – unsuccessfully – to evade liability. Thus, ENRC and the Trio attempted to fool their own specially appointed internal counsel, Dechert LLP, tasked with performing an independent investigation in response to the fraud, bribery and corruption allegations from the UK SFO, by creating an entirely new office and computer system with fake documents.[17] Forensic investigators discovered this fraud and the Trio's own counsel reported this to the SFO which led to a widening corruption investigation against the Trio. When the SFO issued its subpoena, ENRC disingenuously claimed it had lost much of its real data to hackers[18] – a claim widely dismissed in the UK. Thus, any claim here of the sudden and convenient arrival of the Mysterious Thumb Drive by IMR must be taken with a huge grain of salt.

33.     Moreover, the Mysterious Thumb Drive has never been produced for inspection or testing and not a single document from the drive has been produced. Whether the Mysterious Thumb Drive even exists, whether it was created by IMR or their representatives, how it came to arrive so mysteriously at the hotel in London if that is even the truth, all raise the most serious concerns about IMR's story. Reciprocal discovery into the origin and contents of the Mysterious Thumb Drive is sought here both to respond to IMR's allegations here and in the Dutch case and in support of the new actions contemplated against IMR abroad by me, ECVK and EuroChem.

34.     I will submit to the jurisdiction of the Dutch Court in connection with any order of discovery for the materials sought by IMR here.

Dated: September 15, 2015
       New York, NY

_____
Patrick P. Salisbury

---

[1] Exs. 3--9 to the Declaration of Matthew Feser dated September 15, 2015 submitted herewith ("Feser Decl.").

[2] Ex. 10 to Feser Decl., SFO Announcement re: Fraud Investigation dated April 25, 2013 and Ex. 11 to Feser Decl., U.S. Joins Probe of Kazakh Miner ENRC Already Under Investigation in London, Main Justice and Just Anti-Corruption, Aug. 26, 2013.

[3] Ex. 12 to Feser Decl., LSE Notice of ENRC Delisting dated 25 November 2013.

[4] In re: Application of International Mineral Resources, B.V., for an Order To Take Discovery Pursuant to 28 U.S.C. §1782, Case No. 1:14-MC-00340 (GK) (D. D.C.). (the "Washington Case")

[5] Ex. 13 to Feser Decl.

[6] Stein I, ¶ 53. Stein v. Chodiev & Ors [2014] EWHC 1021, (Comm) (16 April 2014) ("Stein I"); and Chodiev & Ors v. Stein [2015] EWHC 1428 (Comm) (20 May 2015) ("Stein II") (affirming $18 MM against Trio).

[7] Stein II, ¶¶ 7-8, 46, 48.

[8] Stein I, ¶ 53. In its ruling, the U.K. High Court also noted the Trio's *"unusually radical programme of disposition, not only of hard copies but of documents contained on computer."* (Id. at ¶ 23). This finding is also in line with the Trio's and its affiliates' reported track record of *"documents being destroyed and electronic data being falsified" "staff forging documents, supplying the wrong computer to the investigative team, and setting up a 'false office.'"* (Ex. 4 and 5 to Feser Decl.).

[9] The members of the Swiss Tribunal are: Chairman Laurent Levy, former President of the Swiss Chamber of Commerce; Gary Born, partner at Wilmer Hale, author of *International Commercial Arbitration* (2d Ed. 2014) and recognized world-wide as a leading arbitrator and scholar on international arbitration (appointed by ECVK); and Jeffrey Gruder, a leading U.K. Queens Counsel (appointed by Shaft Sinkers).

[10] Ex 1 to Feser Decl. (Swiss Award ¶ 1157).

[11] Indeed, shortly after the closing arguments in the Swiss Arbitration, Shaft Sinkers filed for a business rescue proceeding (a type of an insolvency proceeding), which ECVK is currently challenging as an apparent attempt to strip the assets from Shaft Sinkers in anticipation of the Swiss Award.

[12] See Steve Levine, The Oil and the Glory: The Pursuit of Empire and Fortune on the Caspian Sea, pp. 366, 375 (Random House 2007).

[13] Ex. 22 to Feser Decl. Engagement Letter between S&R and Rinat Akhmetshin..

[14] See Ex. 21 to Feser Decl. Financial Times, June 18, 2015.

[15] Salisbury represents ECVK, a Russian company in matters in the Netherlands, France, Switzerland, South Africa and the U.S. Salisbury Decl., ¶ 2. Privilege issues will be governed not only by U.S. law, but also by the laws of Russia, the Netherlands, and South Africa where the privileged communications, arose. Notably, Russia provides a far broader privilege with no crime/fraud exception. Chadbourne, 60 F.Supp.3d at 426-430. Moreover, as in Chadbourne, foreign laws will also prohibit the disclosure of documents sought by IMR.

[16] Ex. 20 to Feser Decl., Burglary and Computer Hacking Add to Woes at ENRC, Telegraph, dated 23 May 2013.

[17] Ex. 21 to Feser Decl., ENRC Press Release dated May 2010. "Potential Loss of Company Data."

[18] Ex. 20 to Feser Decl., ("ENRC leaks so badly why would anyone bother to hack it.").