# Exhibit 27

(1) First Respondent
(2) T Jarmolkiewicz
(3) First
(4) Exhibit "TJ1"
(5) 5 October 2015

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

BETWEEN:

EUROCHEM VOLGA-KALIY LLC

**Applicant**

and

(1) IMR MANAGEMENT SERVICES LIMITED
(2) MR JAI KRISHNA SARAF
(3) MR AMRE ABDELHAMID YOUNESS

**Respondents**

---

### WITNESS STATEMENT OF TADEUSZ JARMOLKIEWICZ

---

I, TADEUSZ JARMOLKIEWICZ, of 81 Glenferness Avenue, Bournemouth, BH3 7ES WILL SAY AS FOLLOWS:

**Introduction**

1. I am a director of the First Respondent, IMR Management Services Limited ('IMSL'). I make this witness statement in opposition to this application for pre-action disclosure.

1

2. Save as otherwise indicated, the contents of this statement are within my own knowledge. Where I refer to matters outside my own knowledge, I have made clear the source of my knowledge and belief.

3. I have adopted Mr Salisbury's abbreviations as contained in his witness statement of 21 July 2015.

4. I refer in this statement to an exhibit marked **[TJ1]**, which contains a bundle of copy documents to which I will refer.

**Alferon and IMSL**

5. I joined Alferon as an employed in-house legal counsel on 2 February 2003 and remained so employed until its business was transferred to IMSL in January 2009, when my employment was transferred to IMSL. My employment with IMSL came to an end on 31 March 2015. Following a board resolution on 2 February 2015, I was appointed as a director of IMSL on 18 March 2015. I continue to work for IMSL *ad hoc* from time to time and for specific projects as a self-employed contractor.

6. Alferon was founded by Dr. Sittard and Mr. Jai Krishna Saraf, the Second Respondent, in 2000. Alferon provided professional services to a company called IMR, which was a private equity investment vehicle. Alferon would identify investment opportunities for IMR within the metals and mining industries. If IMR decided to invest, Alferon would be instrumental in getting the deal done. Following acquisition, Alferon remained involved in the investments at a high level only.

7. From January 2009, IMSL took over the business of Alferon, having had no prior involvement. I understand from Companies House records that IMSL was incorporated in 2007. It did not trade until 2009. Alferon and IMSL audited accounts covering years 2007-2010 are exhibited at **[TJ1]**.

8. Alferon and later IMSL were quite small. For example, as of December 2008, we had two joint Managing Directors supported by about twelve other staff. By the end of 2009 there were only ten people altogether and by the end of 2010 we had shrunk to seven people. IMSL ceased trading in March 2015.

9. During the period of my employment at Alferon and, subsequently, IMSL my duties consisted of providing general in-house legal advice to the company.

**ShS Involvement**

10. Alferon identified ShS to IMR as a possible investment. IMR originally extended a loan to Mrs. Radebe to enable her to purchase ShS from another shareholder. Later, IMR bought into the company.

11. Mr. Saraf was unofficially co-opted as a non-executive director of ShS in about April 2007, on the nomination of Mrs Radebe. This was formalised in November 2007 and he remained a director until 1 January 2010.

12. In January 2010 I was appointed to the board of ShS as a non-executive director and I remained a non-executive director until 1 January 2011.

13. Since Alferon and later IMSL were small companies, I was reasonably aware of what was going on in them. They were very much hands-off as regards IMR's investments and the running of their businesses was left to their own management. Neither Alferon nor IMSL ever made any operational decisions or sought to interfere with local management. This was neither our remit, nor our expertise.

14. So far as I am aware, every director attending ShS board meetings acted in his capacity as a director of ShS. As far as I recall, documents for ShS board meetings that I attended were sent to me in electronic form. At board meetings I would get a hard copy, which I would leave behind after the board meeting ended. I was never told (by anyone at IMSL or any other person) to represent a specific point of view or take a specific approach to board meetings. To the best of my knowledge, no employee of Alferon (or IMSL) ever attempted to materially influence local management of investee companies as regards operational matters.

15. During my time on the board of ShS I never heard any suggestion that the ECVK Project was not feasible and would not be carried through. The executive management, led by Mr. Schroder, the CEO, always appeared confident that the Project was going well. I was aware that there were some delays, but I did not understand them to be more than delays of the usual kind, such as had previously

3

occurred on other projects. I do not recall any detailed discussions regarding delay on the ECVK Project. None of the non-executive directors other than Peet Nel had any shaft construction knowledge or background, and detailed technical aspects were not reviewed at the board meetings in which I took part.

16. Until late summer / early autumn 2012, when I became aware of the dispute between ECVK and ShS, I had not heard about the BASF Report or indeed any other reports referred to by Mr Salisbury or in the draft Order. Likewise, I was not aware of Mr. Skrylnikov or any alleged fraudulent activities at the building site.

**Document storage**

17. I would like to explain the current situation in relation to hard copy and electronic documents within IMSL.

18. Sometime in the middle of December 2014, IMSL decided to start winding down its operations, because the amount of business it was carrying out had reduced significantly and did not justify the overheads associated with maintaining office premises and personnel in London. Mr Youness, the CEO, instructed me to prepare and send redundancy letters to all employees. As part of this process, IMSL's employees, including me, were informed on 31 December 2014 that they would be made redundant with effect from 31 March 2015. As part of the preparation for 31 March 2015, the seven remaining employees of IMSL, including me, were asked to remove personal effects and documents from the offices, identify any hard copy documents which IMSL should keep – for instance Alferon and IMSL incorporation and associated company documents - and dispose of the remainder. This process took a while to complete.

19. The server on which IMSL's electronic documents were stored was powered down by our external IT provider and the office was closed by the end of May 2015. My last day in the office was 15 May 2015. The office is currently not in use and IMSL is making efforts to assign the remainder of the lease, but has not so far achieved that.

20. I stored hard copies of certain IMSL documents which I thought should be kept. They included the statutory books of the company and settlement paperwork regarding the now redundant employees.

4

21. IMSL's IT system was commissioned in about September 2012, when the previous IT system was replaced due to its age. As for the data on the IMSL IT system, I understand that the server could be powered on and searched by an appropriate specialist. A security copy of the powered down server was backed up onto a USB hard drive. In addition, I personally retained a personal back up copy of documents I worked on.

22. At the request of the Dutch lawyers, I reviewed some documents in my possession and supplied some documents to them for the purposes of the Dutch disclosure proceedings brought against IMSL. I did not keep copies of those documents.

**Draft Order**

23. I have read Schedule 1 to the draft Order and have considered carefully whether IMSL may have any documents in each category. By saying "have", I mean whether IMSL has in its possession, custody or control, in hard copy or electronic form, documents within the categories sought or any right to obtain them.

24. The position is that IMSL has a very limited number of responsive hard copy documents. No search has been made of electronic documents, but, for the reasons given below, I do not believe that many responsive documents would be found.

25. IMSL has been running down its business and has now closed its operations and does not have the resources for a search of its electronic documents.

26. It is unlikely that there are many responsive documents to be found on the server, because: (i) they would date from before IMSL replaced its server in 2012 and many folders containing historical documents were deleted in advance of the move to the new IT system; and more importantly (ii) IMSL simply was not involved in operational matters of investee companies.

27. Further, I am informed by IMSL's IT consultants, that to properly search the powered down IT system would require a specialist forensic IT expert. I have taken informal soundings from an expert forensic firm, which gave an initial estimate for the purposes of the Dutch disclosure application. On this basis, I believe that the costs of recovery and review of the documents on IMSL's IT system pursuant to ECVK's

present application is likely to cost in excess of £150,000 (plus VAT). We have not carried out such a search because the cost is very high.

28. I do not understand why the Applicants would wish to pursue IMSL in litigation, as IMSL clearly does not have and never had assets that would discharge any judgment of the magnitude of the arbitration award (which exceeds US$112 million), or even a material fraction thereof.

29. I strongly object to what I feel is a vexatious and an abusive use of the English legal system by ECVK in pursuing IMSL, given the already lengthy multi-jurisdictional litigation undertaken by ECVK, and specifically, given that ECVK has been denied disclosure from IMR BV by the Dutch Courts but is now, nevertheless seeking to obtain similar disclosure from IMSL. There is no basis for any claim against IMSL. I believe that ECVK hopes to obtain documents from IMSL for use in the Dutch proceedings against IMR.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

Signed: 

Full name: TADEUSZ JAN JARMOLKIEWICZ

Dated: 5 October 2015

|     |                    |
| --- | ------------------ |
| (1) | First Respondent   |
| (2) | T Jarmolkiewicz    |
| (3) | First              |
| (4) | Exhibit "TJ1"      |
| (5) | 5 October 2015     |

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

BETWEEN:

EUROCHEM VOLGA-KALIY LLC

**Applicant**

and

(1) **IMR MANAGEMENT SERVICES LIMITED**

(2) **MR JAI KRISHNA SARAF**

(3) **MR AMRE ABDELHAMID YOUNESS**

**Respondents**

---

**WITNESS STATEMENT
OF TADEUSZ JARMOLKIEWICZ**

---

Bryan Cave
88 Wood Street
London
EC2V 7AJ
Tel: 020 3207 1100
Fax: 020 3207 1881
Ref: RJW/6BN/0383200

7