# Exhibit 50

# FILED UNDER SEAL

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| IN RE: | ) | |
| | ) | |
| APPLICATION OF INTERNATIONAL MINERAL | ) | |
| RESOURCES, B.V. FOR AN ORDER TO TAKE | ) | |
| DISCOVERY PURSUANT TO 28 U.S.C. § 1782, | ) | 1:14-MC-00340 (GK) |
| | ) | |
| Applicant. | ) | |
| | ) | |

### THIRD DECLARATION OF RINAT AKHMETSHIN

| | |
|---|---|
| **CITY OF WASHINGTON** | ) |
| | ) **ss:** |
| **DISTRICT OF COLUMBIA** | ) |

   **RINAT AKHMETSHIN,** under penalty of perjury, declares as follows:

   1.   I respectfully submit this Declaration in response to the Court's Order and Memorandum Opinion dated August 19, 2015.  I have always tried to explain the facts involving my engagement as a non-testimonial consulting expert truthfully and transparently and I will endeavor to continue to do so here.  I regret any misunderstanding that I may have created based on my prior statements.  It was never my intention to mislead the Court or create unnecessary proceedings.  I was simply attempting to fulfill my responsibilities as such a non-testifying consulting expert to protect the privileges that belong to my former client EuroChem Volga-Kaliy ("ECVK") with respect to the Dutch action and the European arbitrations.  I believe I have both contractual and ethical obligations to respect my client's request.  Mr. Shapiro's April 6, 2015 correspondence to Mr. Sperduto also suggests that I had a legal obligation to do so.  (A copy of the April 6 email is attached as Exhibit A).

### *My Engagement*

2       As I understand the Court's August 19 Opinion, and prior opinions, the
fact that I was retained as what I now understand to be a "Rule 26(b)(4)(D) non-testimonial
consulting expert" is not an issue.  Your Honor stated in her July 27 Opinion ((Dkt. 48) that "the
Court has little trouble concluding that Mr. Akhmetshin served as a non-testifying expert for
ECVK in connection with the Dutch action." (July 27 Opinion at 6).

3.      I should have done a better job of explaining what I did in my role as the
non-testifying expert and how that role differed from some of my other engagements.  First, I
should have emphasized that perhaps the most important aspect of my engagement was to
research how the Troika and their entities, including Applicant International Mineral Resources
("IMR") structured their corporate family and where, and in which entities, they maintained their
assets.  Mr. Salisbury emphasized this fact when I was retained.  This information was critical to
discover so that any award ECVK might obtain in the Dutch proceeding could be of value.  As I
mentioned in my Second Declaration sworn to June 14, 2015 (Dkt. 38-1) "For Salisbury & Ryan,
I was interested in obtaining information on the three owners of IMR known as the Troika, that is
Alexander Mashkevitch, Patokh Chodiev, and Alijan Ibragimov, and among other things, how
their businesses were structured and the nature of their business assets." (Sec. Dec. ¶ 14).   This
was no easy task given the Troika's efforts to keep that information under wraps, IMR's veil of
secrecy, and the culture in that part of the world in which the Troika operates against full
disclosure.

### *My Research*

4.      To undertake such research, I naturally turned to the sources that I believed to be most informed about the issues at hand.  One such source is what I call the London Information Bazaar, or the political and economic professional "gossip mill" in London, as it relates to financial, political, social, legal, and cultural news or information.  I described this web of sources in my Second Declaration (see Dkt. 38-1, ¶ 14 et seq.), and tried to focus on the fact that investigative journalists were a large part of that web.  In fact, I mentioned my interactions with members of the press in Paragraphs 14, 15, 16, and 17 of my Second Declaration, among others.  There was never any attempt on my part to hide the fact that I exchanged salient information with numerous members of the London press corps, and our Privilege Log clearly identified the members of the press with whom I interacted and exchanged information.  My former Declarations mentioned Simon Goodley of the Guardian, Mark Hollingsworth of the Guardian, Ken Silverstein of Harpers, and Kirstin Ridley of Thomson Reuters by name.  Because my research was focused on locating assets, I limited most of my journalist interactions to reporters covering the London Courts and the London Stock Exchange. All of this was fully disclosed.  No attempt was made to hide the ball on any of my contacts with the press.  The Court summarized its view of these interactions in Part B of its August 19 Opinion, and apparently placed great weight on the fact that based on the emails, in the Court's view, I never asked reporters for information. (Aug. 19 Opinion at 8).  The Court apparently reasoned that I could not have been doing consulting expert research if I was not seeking information from the journalists, concluding that "the flow of information appears to be one-way."

5.      Apparently, I did not do a sufficiently adequate job of describing the fact that my activities truly involved an exchange of information.  I never solicited an article or publication from any of the journalists with whom I met.  To the best of my recollection, these exchanges were virtually always a "two-way street" and it was certainly my intent and expectation that they would be exchanges of useful information.   I should have done a better job of explaining the information that I received as the result of the research I did, particularly with journalists.  As more fully described below, I received critical parts of the information I obtained from these journalists, including new leads, sources, relationships, publications, NGOs with interest, articles, investigative reports, and related facts in exchange for the information I provided about the Dutch litigation.

6.      Participants in the London Information Bazaar are self-interested and provide information in exchange for other information. This is particularly true of investigative journalists in the competitive London news market including publications ranging from the most respected journals to the tackiest tabloids.  A good number of the emails reflecting my research on the London Information Exchange reflect this two-way street and the fact that information was going both ways.  (See Priv. Log entry 165 ("compare notes")).   But in addition to the emails, I received information from many of these journalists in face-to-face meetings. For example, Scott Horton (Contributing Editor, Harper's) and I met in person at MOMA in New York on January 7, 2013 and discussed the Troika at length.  (See AKH 872, copy attached as Ex. B).  That same email thread reflects that Mr. Horton later reached out to me in May of 2013 to meet with me about "connections between ENRC and Benny Steinmetz" because he had "recently heard a good bit about dealings between Mashkevich and Steinmetz . . . ."  I replied

4

that we should "compare notes." I received valuable information on these topics from Mr. Horton.

7.      Similarly, Exhibit W to ECVK's Opposition Brief (AKH 637-38, copy attached as Ex. C) demonstrates Mark Hollingsworth's eagerness to meet with me to share "a lot of new information and documents about the Trio. I also have some new data about IMR and Amre Younis who is a major player for The Trio." Mr. Hollingsworth added "Please tell Patrick Salisbury that I am happy to exchange information . . . ." (AKH 637). On April 4, 2013, the very same day, I replied "let's try to make those info exchanges . . . ." I met with Mark Hollingsworth in person on at least two occasions, I believe once before the April email exchange and once soon thereafter. Mr. Hollingsworth, who wrote extensively on issues of corruption and foreign affairs, told me that he was working on a story about the Troika. In both of our face-to-face meetings, he provided me with a number of very helpful documents including several private written intelligence reports. These documents catalogued numerous fraudulent and deceptive acts by the Troika and were truly a font of information about the Troika. Mr. Hollingsworth told me that he had obtained these materials in the course of his reporting efforts in London. In exchange for this extensive and highly valuable non-public information, I provided Mr. Hollingsworth with public information about the Dutch action.

8.      In fact, that whole exchange between Mr. Hollingsworth and me exemplifies how the London Information Bazaar works -- Mark offers to share his "new information" about the Trio with me and in exchange he is "keen to catch up on the IMR lawsuit." He even proposes to meet with Mr. Salisbury. In subsequent emails, Mr. Hollingsworth offers to "brief" me. (AKH 881). In fact, although I was not present, it is my belief that Mr. Salisbury and Mr. Hollingsworth met in person, through my introduction, to have

5

the "exchange of information" that Mr. Hollingsworth proposed in AKH 637.  It is my

understanding that Mr. Salisbury found that "information exchange" worthwhile.  Like the

Horton interaction, the Hollingsworth exchange was truly a "two-way street."

      9.      Through these meetings with members of the press I would often

"compare notes" or "exchange ideas" or discuss new or alternative sources of information.

Indeed, Priv. Log 165 is an example of Daniel Balint-Kurti of the NGO think-tank Global

Witness putting me in touch with a reporter for the Guardian, Simon Goodley, because we could

"have some interesting discussions concerning the Troika."  In early 2013, I had a face to face

meeting with Mr. Goodley.  Given Mr. Goodley's long track record of covering the Troika, I was

keen to find out what he knew about IMR, an entity practically hidden from public view.  I found

Mr. Goodley very knowledgeable in general, and very helpful about the Troika.  I learned from

Mr. Goodley about alleged United States and United Kingdom investigations into the Troika's

business activity, and about the status of the British Serious Fraud Office investigation of ENRC.

This meeting occurred at the Wolseley Café in Mayfair.

      10.      Again, the Goodley research exemplifies the London Information

Exchange.  One contact with information (Mr. Balint-Kurti) could lead to another contact or lead

(Mr. Goodley), all with a pre-existing interest in the Troika and their business affairs.  That is

how the London Information Bazaar works.  As the Hollingsworth example illustrates, I

regularly kept Mr. Salisbury apprised of my research efforts in London and he encouraged me to

continue those efforts.

      11.      On July 17 or 18, 2012, I met with Kirstin Ridley, European Financial

Correspondent for Thomson Reuters.  This breakfast meeting also occurred at the Wolseley Café

in Mayfair.  I also obtained Ms. Ridley's name as a potential source from Mr. Balint-Kurti.  At

the time we met, Ms. Ridley covered the London Courts and she confirmed that she was

following cases involving companies from areas that comprised part of the former Soviet Union.

Some of those cases were not widely known to the public.  I learned from Ms. Ridley that she

had information about, and perhaps access to, an alleged whistleblower in one of the Troika's

companies.  That whistleblower had already approached authorities with information concerning

conduct involving the Foreign Corrupt Practices Act and how that company was involved.  I

never was able to identify or locate the individual that allegedly performed the whistleblower

activities.  I also learned new facts from Ms. Ridley concerning the Troika's alleged bribery and

fraud.  All of this information was valuable and relevant for my ECVK research.

12.     I routinely and systematically conveyed the results of these meetings, and

my research in general, to Mr. Salisbury.  Mr. Salisbury seemed to be pleased with the new

information we were receiving as a result of my research -- and, until Memorial Day of 2013,

encouraged me to carry on.

### *Strategic Communications Campaigns As I Know Them.*

13.     As the Court noted in Part B of its August 19 Opinion, there is no doubt

that I was engaged with the press with respect to my research efforts on behalf of ECVK.  I have

tried to be transparent about that fact in my prior submissions to the Court.  I have not tried to

hide or obscure any of my communications with the press.  But the Court ascribed a vastly

different conclusion about my motivations for the events I disclosed.  My research and

communications were far different from what I understand "strategic communications work" to

be.  And that distinction takes on even greater significance in the factual circumstances involved

here in which I explicitly proposed (twice) to undertake what I understood a "strategic

communications work" to be.  On prior engagements, when I have been asked to perform

7

"strategic communications work" it entails far more focused advocacy and wider scope of activities than my research for ECVK. For example, in the past I have conducted strategic communications campaigns that involved planting editorials in newspapers, paying for advertisements in newspapers, mobilizing and educating blogs and other electronic sources, attempting to place sympathetic advocates for my clients' causes on television news shows or radio talk shows, drafting letters to carefully selected members of the relevant House committee(s), composing advocacy pieces to specifically identified members of the relevant Senate committee(s), lobbying and meeting with relevant Administrative agencies, and possibly even letters to sympathetic White House or Executive Office staffers. Depending on the issue and the client, one might consider placing public service announcements or similar advocacy pieces as well. A strategic communications campaign to me is an expensive, multi-faceted, integrated, comprehensive effort to reach decision makers (typically legislators or administration officials) and opinion leaders (typically the press) with a well-designed campaign to educate and persuade. In contrast, my correspondence with journalists regarding my expert research on behalf of ECVK was wan by comparison. Nor did my interactions with journalists include the intent, scope of effort, elements, actors, legislators, administrative officials, or financing that I understand a "strategic communications work" to include, or that they have included when I have been involved in the past.

14.     The fact that there was no "strategic communications work" -- at least as I understand that term, and in contrast to my interactions with journalists on the London Information Exchange -- is further corroborated by the fact that I met with ECVK and a Salisbury & Ryan attorney in Moscow on September 19, 2012 to evaluate whether ECVK wanted to undertake such an effort in conjunction with the filing of the Russian criminal

8

investigation. This sequence of events was related in detail in Paragraphs 10 – 12 of my Second

Declaration (Dkt. 38-1). There would have been absolutely no reason to have such a meeting at

such great effort and expense had there been "strategic communications work" already

underway. That is also the explanation for the reference in Priv. Log 76, dated September 7,

2012, for the reference to "the PR campaign that we have been discussing." That email was

simply an introduction by Mr. Salisbury of me to Valery Sidnev of the EuroChem legal

department in anticipation of our meeting on September 19, less than two weeks later. Mr.

Sidnev, General Counsel, submitted a Declaration In this proceeding on June 18, 2015, in which

he describes the September 19 meeting. (Dkt. 39- ¶¶ 14-160. (Please see also the Declaration

of Vladimir V. Krakhmalnyy, dated June 11, 2015 (Dkt. 39-2) at ¶¶ 5 – 8). At that September 19

meeting my strategic communications proposal was rejected.

15.     Finally, although I did not realize it at the time, the fact that there was no

real "strategic communications work" (at least as I understand and use that term) was

corroborated at my deposition on April 8. IMR's counsel asked me whether I recognized a series

of ten names, all of which I did not recognize. I did not know then, but I do now, that those

individuals were all reporters or journalists who had written probing or  negative articles about

ENRC during the relevant time period. I did not recognize a single name. (Depo Tr. at 248 line

16 through 250, line 3, copy attached as Exhibit D). If in fact I had been conducting a "strategic

communications campaign" that list of names is exactly the people I would have sought out

because they had already written negative articles about the Troika or their assets or activities.

### *My Ongoing Relationship With Former Prime Minister Kazhegeldin.*

16.     My ongoing relationship with former Kazakhstan Prime Minister Akezhan

Kazhegeldin forms the factual backdrop to Part E (pages 12-15) of the Court's August 19

Opinion. Other than the London Information Exchange, this relationship turned out to be the second most important resource for conducting my expert research on the Troika and their assets. I alluded to my relationship with Prime Minister Kazhegeldin in Paragraph 16 of my Second Declaration (Dkt. 38-1) and suggested that my relationship with Mr. Kazhegeldin made it possible for me to "obtain information" about the Troika in my research efforts.

17.     I have represented Prime Minister Kazhegeldin in a variety of matters since the late 1990s. He is also a current client. Mr. Kazhegeldin now lives in exile in London and is viewed as a political opponent to the incumbent Kazakh regime of Nursultan Nazarbayev. Mr. Kazhegeldin has received repeated death threats, to the point that he has received, or is receiving, or from time to time has intermittently received, Scotland Yard Special Branch security protection. I believe that my relationship with Mr. Kazhegeldin and the interests within Kazakhstan that he represents or with whom he shares similar political views has provided me invaluable insight into the politics, economy, society, and culture of Kazakhstan, including the way business is conducted there. In my opinion, those insights and relationships constitute a large part of the reason that ECVK engaged me as a non-testifying expert in the first place.

18.     Because Mr. Kazhegeldin is concerned with bribery and corruption as it relates to the extraction economy of Kazakhstan, among other reasons, he has an ongoing interest in the Troika given their extensive mining and extraction businesses in Kazakhstan. How the Troika obtained those mining rights is a subject of keen interest not only to Mr. Kazhegeldin, but also to Kazakhstan citizens, and many members of the London press corps (and participants in the London Information Bazaar) interested either in Kazakhstan or the numerous scandals surrounding the Troika and the delisting of their formerly public company ENRC. (See my Second Declaration, DKT 38-1, at ¶ 16). Indeed, once the ENRC delisting scandal broke in

10

London, the London press was ravenous for information about the Troika and how they made

their fortunes in Kazakhstan and the "opaque" privatization system from which the Troika

profited. (See article dated May 3, 2013 from The Sunday Times, at Priv. Log 231 "ENRC

Founders Made Good In Kazakhstan.").

    19. Because Kazakhstan owned, both directly and indirectly, a significant

minority shareholder interest in ENRC while it was still a publicly traded company on the

London Stock Exchange, once the cries and demands for delisting accelerated, Mr. Kazhegeldin

became concerned with the effect that delisting might have on the value of Kazakhstan's

interests.  He also wondered if there was some way by which to benefit Kazakhstan by the legal

proceedings attendant to the delisting process.  So when the ENRC de-listing crisis surfaced, but

before the company was delisted, Mr. Kazhegeldin formed a legal team consisting of Mr.

Lieberman as counsel and me as consulting expert to explore what legal steps might be taken to

protect Kazakhstan's interests as both direct and indirect minority shareholder.  Indeed, Mr.

Lieberman and I had worked together successfully as a team on behalf of the former Prime

Minister for about 18 years, on numerous projects, so we have a long-standing and compatible

working relationship on sensitive legal matters.[1]  Mr. Kazhegeldin was also aware that I was

deeply involved in researching the Troika's companies and assets.  Given the sensitivity of the

issue, chronic security concerns for the former Prime Minister, and the obvious fact that in a

corporate change of control context, information is power, Mr. Kazhegeldin requested that we

---

[1]  Because Mr. Lieberman and I have worked on so many projects together, and I have reached out to him for legal advice since at least 1998, as a layman I consider him "my attorney."  As is more fully explained below, I may have been acting as an agent for my employer IEI for some of our past projects such that IEI may have been the technical defined client in some cases, acting through my efforts as Director.  Even if that is the case in some instances, many of the conversations I have had with Mr. Lieberman included only the two of us, reinforcing my perception that Mr. Lieberman was "my" attorney.  In fact, when Mr. Lieberman joined me in meeting with attorneys at Sperduto Thompson I introduced him as my personal attorney.  With respect to the motion to compel, however, we were working as a team on behalf of our ultimate client, Prime Minister Kazhegeldin.  I did not understand the significance of explaining the distinction before since, in both contexts, I considered Mr. Lieberman "my attorney."

closely guard and maintain the confidentiality of our efforts, and assert all applicable legal positions in an effort to preserve those confidences.

20.    Because Prime Minister Kazhegeldin is a long-time client, and because he has an interest in the Troika's Kazakhstan assets, I believed that, if properly managed, I could reach out to Mr. Kazhegeldin on behalf of ECVK for information he might have about the Troika, ENRC, IMR, or the nature and location of their assets. Using one client to assist another is obviously sensitive business, particularly when one client is a former Prime Minister living in exile because he is viewed as a political enemy of the incumbent regime. Before I approached Mr. Kazhegeldin about my ECVK expert research, I informed Mr. Salisbury of my intentions. Once I approached Mr. Kazhegeldin for assistance, he agreed to try to help, subject to strict restrictions on confidentiality, the sources of his information, and related sensitive topics.

21.    The reference in Priv. Log 54 (July 13, 2012) that "the project is already up and running" is simply a reference to the fact that I had approached Mr. Kazhegeldin and that he had agreed to participate and had his associates begin the search for materials available to him for relevant information. The reference in Priv. Log 57 (July 23, 2012) that "the indexing is done" and "send me a list of terms/names for the scan" is simply a reference to the fact that the database had been compiled and that Mr. Kazhegeldin's team was ready to search for relevant materials. The reference in Priv. Log 67 (August 30, 2012) to it "looks like the work is finally completed" is simply a reference to the fact that the searches had been run by the former Prime Minister's team. My email to Patrick in Priv. Log 66 (August 13, 2012) to "the thing" is a reference to the collected electronic data and to the fact that I had no idea how that information was to be packaged. I did not know whether I would receive a compact disc, an external hard drive, a laptop, or memory stick, so I simply called it "the thing" in my emails in Priv. Log 66,

12

70, and 121. "The thing" and the data that it contained came from sources available to Prime

Minister Kazhegeldin in Kazakhstan and London. I have already noted in past filings how

extensive the leaks were in London from ENRC's own officers and directors and how easy it was

to obtain purportedly "confidential" information about ENRC. (See my original Affidavit (Dkt.

10-1), sworn to May 14, 2013 at ¶ 13).

   22. I know my language and emails sound cryptic. They were. The purpose

of that intentionally obscure language was my effort to protect the source of the information, that

is, my now futile effort to protect the source of the information as Mr. Kazhegeldin. And

because I had kept Mr. Salisbury apprised of these efforts, he understood exactly what I meant. I

had promised the former Prime Minister that I would do what I could to protect his identity as a

source and at the time these emails were written I made an effort to do so. At the time Priv. Log

66 and related emails were written they were crafted to be a "linguistic shield" intended to

protect a man I consider to be a courageous and democratic statesman fighting for the people of

Kazakhstan.

   23. I now understand that the use of such cryptic language can make the

wrong impression because on or about March 12, 2015 I spent about five hours at the law firm of

Sperduto Thompson PLC explaining all this to Kim Sperduto and Joshua Kauke. While I

understand that those conversations are privileged, we spent time going through each and every

one of the emails cited by the Court on pages 14-15 of the August 19 Opinion (and

approximately two dozen or so more), especially focusing on "the thing" and the sources of

information. Mr. Sperduto had extensive notes and probing questions about every email that is

listed in this context in the August 19 Memorandum Opinion. Mr. Sperduto and Mr. Kauke even

made me search my Skype account for evidence of communications relevant to the February 5

Subpoena even though the term Skype does not appear anywhere in that Subpoena. We withheld a copy of the one responsive Skype document as privileged, and the Court agreed. (Priv. Log 185).

24.     My explanations for the use of such language were not done yet. On or about June 4, 2015, I spent another four hours or so explaining these emails in another meeting at Sperduto Thompson, this time with not only my counsel present but also Mr. Salisbury, Mr. Shapiro, and Mr. Rawson, all counsel for ECVK. I did my best, again, to explain the sources of my information and the reason for the cryptic language I used.

### *Mr. Lieberman's Representation Of Mr. Kazhegeldin.*

25.     I would also like to provide the Court more information about the discussion in Parts F and G of the August 19 Memorandum Opinion. As I described in my Affidavit dated May 14, 2014, I am Director of the International Eurasian Institute for Economic and Political Research ("IEI"). (Akh. Aff. at ¶ 4). Mr. Lieberman hired me for that position in 1998 and, along with Mr. Kazhegeldin, was one of the leading forces in creating IEI. Since 1998, Mr. Lieberman and I have worked on numerous legal projects together, usually of a sensitive nature. In the course of those projects, over the years I have frequently asked Mr. Lieberman for his legal opinion or otherwise sought out his legal advice. Most of these conversations were one-on-one, with only Mr. Lieberman and me present. Because I was asking the questions and Mr. Lieberman was answering my questions and we were the only people present, I considered Mr. Lieberman my personal attorney. A good number of these efforts were undertaken on behalf of IEI, and some were undertaken in conjunction with Mr. Kazhegeldin. I never bothered to stop to ponder the question whether Mr. Lieberman was representing me, or IEI, or both. We just worked together, and have done so since 1998.

14

26.     As those relationships relate to the issues at hand, Mr. Kazhegeldin was quite interested in the delisting of ENRC from the London Stock exchange because the Kazakh government was a minority shareholder of ENRC. Mr. Kazhegeldin retained both Mr. Lieberman as counsel, and me as expert advisor, to attempt to stop or affect the ENRC delisting to both (1) attempt to preserve some of the value of the government's minority shareholder position, and (2) to make an effort by either the government itself or other Kazakh entities to buy the shares that would be available given the sanctions against the Troika or forfeiture of shares by the Troika that might occur in conjunction with a delisting. Thus, Mr. Lieberman and I were a close-knit team working together on behalf of Prime Minister Kazhegeldin in a legal effort to impact the legal proceedings and outcomes surrounding delisting.

27.     The email in Priv. Log 207 is my communication to Mr. Lieberman to apprise him of facts and events surrounding ENRC's legal issues prompting the delisting, in this particular case forwarding facts in the form of a Guardian article about the Serious Fraud Office's investigation of ENRC. I transmitted those facts to Mr. Lieberman as part of our representation of Mr. Kazhegeldin to devise our legal strategy based on the most current events and developments in London.  The communication in Priv. Log 217 is Mr. Lieberman's effort to keep me up to date on developments by forwarding another Guardian article relevant to facts necessary to formulate our legal strategy. Priv. Log 218 is a written example of my personal vanity and inflated sense of self-importance, although I believed at the time that this expression of vanity was a confidential communication to a close friend and confidant. Priv. Log 219 is Mr. Lieberman's gracious acknowledgment (and implicit forgiveness) of my vanity.

28.     The "third-party" the Court references on page 16 of its August 19 opinion is in fact Mr. Kazhegeldin, our joint client, not a third-party at all. Thus, the communications in

Priv. Log 220, 221, 222, 224, 225, 231, and 232 are all relaying factual developments to or among the three key team members devising a legal strategy to impact the delisting process. And this occurred in the context of efforts by the Troika to take ENRC private out of the de-listing. Perhaps the email in this chain that sheds most light on that is the May 7 email in Priv. Log 231 where Mr. Lieberman offers the explicit legal advice "I'd go for some injunction (assuming UK law) to prevent the completion of the takeover. . . ."   That advice was based on the factual developments reflected in the emails beginning with Priv. Log 207. That fact is corroborated by the dates on these emails which range from April 25, 2013 (Priv. Log 207) through the May 2 discussion of potential lawsuits to provide leverage in negotiations against the Troika (Priv. Log 221) through the May 7 injunction discussion (Priv. Log 231). In fact, that possible injunction strategy was precipitated by Dow Jones Newswires report two days earlier (May 5) that "Russian Banks to Back Bid [by the Troika] for Eurasian Natural Resources." (Priv. Log 228). The reference that seems to concern the Court regarding "communications to a third party . . . whose job apparently was 'to sell it'" refers to Mr. Lieberman's communication as counsel regarding his client Mr. Kazhegeldin who, to implement the legal strategy discussed, would necessarily have to "sell it" (that is, sell the strategy) to those parts of the Kazakh government, including Kazakhyms (see Priv. Log 220), controlling Kazakhstan's direct and indirect interests in the public version of ENRC.

29.     The email address Mr. Lieberman and I used to reach Mr. Kazhegeldin during this time period was 2703tarazuisun@gmail.com. (See August 19 Memorandum Opinion

at 17).

I declare under penalty of perjury of the laws of the United States that the

16

foregoing is true and correct.

DATED:      Washington, D.C.
            August 31, 2015

_____
Rinat Akhmetshin

# EXHIBIT A

Edward J. Shapiro
Direct Dial: 202-637-2273
edward.shapiro@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

# LATHAM&WATKINSLLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Milan |
| Barcelona | Moscow |
| Beijing | Munich |
| Boston | New Jersey |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Doha | Riyadh |
| Dubai | Rome |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Shanghai |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

April 6, 2015

VIA E-MAIL

Kim Hoyt Sperduto, Esq.
Sperduto Thompson PLC
1133 Twentieth Street, N.W., Second Floor
Washington, D.C. 20036

Re: *In re Application of International Mineral Resources*, 1:14-mc-00340-GK

Dear Mr. Sperduto:

I write on behalf of EuroChem Volga-Kaliy ("ECVK") regarding the April 7, 2015 deposition of your client Rinat Akhmetshin in the above-referenced matter.

As you know, Salisbury & Ryan LLP, as counsel for ECVK, retained Mr. Akhmetshin from July 2012 to May 2013 as a non-testifying consulting expert in anticipation of litigation. Accordingly, ECVK and Mr. Akhmetshin are protected by Federal Rule of Civil Procedure 26(b)(4)(D) from any obligation that Mr. Akhmetshin answer deposition questions concerning facts he knows and opinions he holds related to his retention. Similarly, all communications between Mr. Akhmetshin, Salisbury & Ryan, and ECVK, and all information, data, and work product generated by or exchanged among Mr. Akhmetshin, Salisbury & Ryan, and ECVK are privileged and confidential under the attorney work product doctrine (and substantial portions are protected by the attorney-client privilege as well). As Mr. Akhmetshin's engagement letter with Salisbury & Ryan states, Mr. Akhmetshin is required to maintain the confidentiality associated with those privileges. This duty survives the completion of his engagement by Salisbury & Ryan. All communications between Mr. Akhmetshin, Salisbury & Ryan, and ECVK in connection with Mr. Akhmetshin's retention and all work product that Mr. Akhmetshin generated or received in connection with his retention accordingly remain privileged and confidential, and all facts known and opinions that Mr. Akhmetshin holds of relevance to the subject matter of his engagement are similarly not a permitted subject of deposition discovery.

In the above-referenced matter, you have (1) already asserted applicable privileges to withhold from production to International Mineral Resources all documents that are protected from disclosure by those principles; and (2) confirmed that you will continue to fully assert all applicable privileges and rules, including at Mr. Akhmetshin's deposition tomorrow.

April 6, 2015
Page 2

**LATHAM&WATKINS**LLP

Thank you for your cooperation, and Mr. Akhmetshin's, in protecting the privileges to which ECVK is entitled.

Sincerely,

Edward J. Shapiro
of LATHAM & WATKINS LLP

cc: Patrick Salisbury, Esq.

# EXHIBIT B

`RE: Mashkevich

**Subject:** RE: Mashkevich
**From:** rinat akhmetshin <akhmetshin@gmail.com>
**Date:** 5/28/2013 3:27 PM
**To:** Scott Horton <shorton99@aol.com>

got it

Отправлено с моего Windows Phone

**From:** Scott Horton
**Sent:** 5/28/2013 15:20
**To:** akhmetshin@gmail.com
**Subject:** Mashkevich

Beny Steinmetz
Asher Avidan
Dag Cramér
Roy Oron
Marc Struik
Frédéric Cilins
Michael Noy
Avraham Lev Ran

Pentler Holdings Ltd
BSG
BSGR
BSG Ressources Guinée Ltd
BVG

Simandóu
Zogota

-------------------------------------------------------

SCOTT HORTON
*Contributing Editor, Harper's Magazine*
Tel. +1 917 216 2319
Email shorton99@aol.com

-----Original Message-----
From: rinat akhmetshin <akhmetshin@gmail.com>
To: Scott Horton <shorton99@aol.com>
Sent: Tue, May 21, 2013 11:33 am
Subject: RE: ENRC

Deal!

Отправлено с моего Windows Phone

AKH000871

**From:** Scott Horton
**Sent:** 5/21/2013 10:25
**To:** akhmetshin@gmail.com
**Subject:** Re: ENRC

Let's discuss immediately when you get back. Ring me as soon as you can on return.
Cheers.

------------------------------------------------------------------

SCOTT HORTON
*Contributing Editor, Harper's Magazine*
Tel. +1 917 216 2319
Email shorton99@aol.com

-----Original Message-----
From: rinat akhmetshin <akhmetshin@gmail.com>
To: Scott Horton <shorton99@aol.com>
Sent: Tue, May 21, 2013 10:10 am
Subject: RE: ENRC

Funny enough am working on the similar matter related to trio and their actions in Russia. Let's compare notes. In Moscow , back tomorrow. Talk soon! ra

Отправлено с моего Windows Phone

**From:** Scott Horton
**Sent:** 5/21/2013 7:53
**To:** akhmetshin@gmail.com
**Subject:** ENRC

Rinat,

I am studying connections between ENRC and Beny Steinmetz and have recently
heard a good bit about dealings between Mashkevich and Steinmetz relating to Guinea.
Any chance you know anything about this? Love to catch up.

-----Original Message-----
From: rinat akhmetshin <akhmetshin@gmail.com>
To: Scott Horton <shorton99@aol.com>
Sent: Sun, Jan 6, 2013 5:41 pm
Subject: Re: ny

modern at 1600 tomorrow is confirmed! c u there! ra

On Sun, Jan 6, 2013 at 5:40 PM, Scott Horton <shorton99@aol.com> wrote:
  perfect. c u there @ 1600 h.

AKH000872

-------------------------------------------------------------------

SCOTT HORTON
*Contributing Editor, Harper's Magazine*
Tel. +1 917 216 2319
Email shorton99@aol.com

-----Original Message-----
From: rinat akhmetshin <akhmetshin@gmail.com>
To: Scott Horton <shorton99@aol.com>
Sent: Sun, Jan 6, 2013 5:15 pm
Subject: Re: ny

how about modern - restaurant at moma - they have a nice bar and decent wine list

On Sun, Jan 6, 2013 at 5:14 PM, Scott Horton <shorton99@aol.com> wrote:
  we'll find a spot midtown--any ideas?

----------------------------------------------------------------

SCOTT HORTON
*Contributing Editor, Harper's Magazine*
Tel. +1 917 216 2319
Email shorton99@aol.com

-----Original Message-----
From: rinat akhmetshin <akhmetshin@gmail.com>
To: Scott Horton <shorton99@aol.com>
Sent: Sun, Jan 6, 2013 5:01 pm
Subject: Re: ny

perfect! where shall we meet?

On Sun, Jan 6, 2013 at 4:59 PM, Scott Horton <shorton99@aol.com> wrote:
  Monday around 4 should be okay.

----------------------------------------------------------------

SCOTT HORTON
*Contributing Editor, Harper's Magazine*
Tel. +1 917 216 2319
Email shorton99@aol.com

-----Original Message-----
From: rinat akhmetshin <akhmetshin@gmail.com>
To: Scott Horton <shorton99@aol.com>
Sent: Sun, Jan 6, 2013 4:51 pm
Subject: ny

tovarish, looks like i am in ny tomorrow and tue. i will be busy mid day but can meet up late afternoon
some place midtown on monday or early on tuesday. pls let me know if you are around. ra

AKH000873

RE: Mashkevich

AKH000874

# EXHIBIT C

**Subject:** RE: FW: served writ + translation
**From:** rinat akhmetshin <akhmetshin@gmail.com>
**Date:** 4/9/2013 5:06 AM
**To:** Mark Hollingsworth <markhollingsworthxx@gmail.com>

Talk next week and safe travels, Mark!!

Отправлено с моего Windows Phone

**From:** Mark Hollingsworth
**Sent:** 4/8/2013 19:47
**To:** rinat akhmetshin
**Subject:** Re: FW: served writ + translation

Rinat,

Unfortunately, I am abroad and not back in London until Friday morning.

But if you are still in town on Friday, please call me.

I am keen to catch up on the IMR lawsuit and so let's talk soon

Mark

On 8 April 2013 15:00, rinat akhmetshin <akhmetshin@gmail.com> wrote:
· mark, i will be transiting through london tomorrow. are you around to meet for a quick tea?

|

On Thu, Apr 4, 2013 at 5:22 PM, rinat akhmetshin <akhmetshin@gmail.com> wrote:
Excellent, Mark! Let's try to make those info exchanges and talk once you are back. Travel safe!! ra

Отправлено с моего Windows Phone

**From:** Mark Hollingsworth
**Sent:** 4/4/2013 13:23
**To:** rinat akhmetshin
**Subject:** Re: FW: served writ + translation

Rinat,

Many thanks for this which is of great interest. I have a lot of new information and
documents about The Trio. I also have some new data about IMR and Amre Younis who
is a major player for The Trio. Please tell Patrick Salisbury that I am happy to exchange
information, but I am travelling abroad from tomorrow and will be away for a week.

AKH000637

Please also tell Patrick that I would be happy to meet him when he is next in London. There are amazing developments at ENRC at present but I assume this is only of interest indirectly - or perhaps not??

I will email Patrick directly but I think it would be useful if you also email Patrick with my comments

Good luck with your investigation and please do not hesitate to ask for my help

Very best

Mark


On 4 April 2013 17:45, rinat akhmetshin <akhmetshin@gmail.com> wrote:
Mark, the lawsuit was filed in Amsterdam last week by EuroChem Volga-Kaliy LLC, a subsidiary of EuroChem.. The official Dutch version and the English translation are attached. There are documents supporting each claim which were also filed and available if you need the. the name of the US lawyer who handles it is "Patrick Salisbury" <PS@salisburyryan.com>. he is ready to talk about the case. ra

AKH000638

# EXHIBIT D

[Page 1]

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - -X

IN RE:                              )

                                    ) 1:14-MC-00340 GK

APPLICATION OF INTERNATIONAL   ) JUDGE KESSLER

MINERAL RESOURCES, B.V. FOR AN )

ORDER TO TAKE DISCOVERY        )

PURSUANT TO 28 U.S.C. 1782,    )

              Applicant.       )

- - - - - - - - - - - - - - - -X


(CONFIDENTIAL PORTIONS NOT INCLUDED)


Videotaped Deposition of RINAT AKHMETSHIN

Washington, D.C.

Tuesday, April 7, 2015

9:41 a.m.


Job No.   141469

Pages:    1 - 274

Reported by:  Dana C. Ryan, RPR, CRR

1    MR. COGAN: No, I asked that question,
2  and he answered a different question.
3    MR. SPERDUTO: No, you're disappointed
4  in his answer, and you're trying again. You don't
5  get two dips. Move on.
6  BY MR. COGAN:
7    Q   Okay. You can answer the question.
8    MR. SPERDUTO: No, you can't.
9    MR. COGAN: So you're instructing the
10  witness not to answer --
11    MR. SPERDUTO: You can --
12    MR. COGAN: -- that question?
13    MR. SPERDUTO: -- read back his answer.
14  He already answered that. Exactly the same words.
15    MR. COGAN: Are you instructing him not
16  to answer my question?
17    MR. SPERDUTO: I'm instructing him not
18  to answer it again. He answered that in exactly
19  the same words.
20    MR. COGAN: What's the basis for your
21  instruction?
22    MR. SPERDUTO: Asked and answered. He
23  answered it.
24    MR. COGAN: You and I both know that's
25  not an appropriate instruction.

[Page 246]

1    MR. SPERDUTO: You're trying to get a
2  different answer. That's all. You and I both
3  know that.
4    I didn't hear -- can you tell me what
5  the difference is in that question and the
6  question immediately before that?
7    MR. COGAN: It's identi- --
8    MR. SPERDUTO: It's almost --
9    MR. COGAN: It was an identical
10  question because I didn't get a response to the
11  question I asked. I'll ask it --
12    MR. SPERDUTO: You did get a response.
13  You didn't like the response.
14    MR. COGAN: I'll ask the question again
15  and you can either instruct or not.
16  BY MR. COGAN:
17    Q   Does this document refresh your
18  recollection as to whether you were providing
19  Mr. Goodley with information in connection with
20  the work that you were doing for Mr. Salisbury?
21    MR. SPERDUTO: Asked and answered a
22  third time.
23  BY MR. COGAN:
24    Q   You can answer.
25    A   I did not write these documents saying

[Page 247]

1  it was Mr. Salisbury's document to begin with. It
2  was these documents which were drafted by the
3  Dutch lawyer. I believe Mr. Salisbury, to the
4  best of my knowledge, is not admitted in
5  Netherlands.
6    So this was a publicly available
7  document that was available to everyone in
8  Netherland. I believe the Guardian newspaper
9  obtained it independently by themselves.
10    So all Mr. Goodley was asking is for
11  these favor to pointing his in-house lawyers in
12  the right direction of how to obtain these
13  documents. It has nothing to do with my work for
14  Salisbury & Ryan which was only in the capacity of
15  consulting expert.
16    Q   I'm going to read you a list of names,
17  and for each of them my question is, first, do you
18  know -- do you know the person, okay?
19    A   Uh-huh.
20    Q   Rupert Meate, M-E-A-T-E?
21    A   It doesn't sound familiar.
22    Q   Christopher Thompson?
23    A   It doesn't sound familiar.
24    Q   Caroline Bennum (phonetics)?
25    A   Don't know that person.

[Page 248]

1    Q   Alex McDonald?
2    A   No.
3    Q   I don't know how to pronounce his name
4  so I'm going to spell it. First name J-O-R-I-S;
5  last name L-U-Y-E-N-D-I-J-K?
6    A   It's -- I'm not very good at spelling.
7  Could you try to read it the way you could read
8  it?
9    Q   So Joris Luyendijk.
10    A   Luyendijk does not sound familiar.
11    Q   Rob Davies (phonetic)?
12    A   No, I don't know that person.
13    Q   William McNamara?
14    A   No, I don't know.
15    Q   Stanley Pignall (phonetic)?
16    A   Not familiar with that name.
17    Q   Rowena Mason?
18    A   Never met that person.
19    Q   Did you ever have -- do you know who
20  the person is?
21    A   No.
22    Q   Ben Harrington?
23    A   (Witness shakes head.)
24    Q   Can I get an audible response on that
25  last one?

[Page 249]

[63]  (Pages 246 to 249)

| | |
|---|---|
| 1      A   No. | 1           Am I pronouncing that right? |
| 2      Q   Okay. | 2           MR. SPERDUTO:  Kauke. |
| 3      A   Sorry. | 3        BY MR. COGAN: |
| 4      Q   Just to go back very briefly to earlier | 4      Q   -- Kauke from Mr. Sperduto's firm wrote |
| 5   testimony, with respect to the hard drive of | 5   to me and two of my colleagues an email, subject |
| 6   documents that you provided to Mr. Halpert, I | 6   line, Akhmetshin Production.  Good morning, Late |
| 7   believe you testified that you got those documents | 7   Friday we learned from ECVK counsel that ECVK no |
| 8   from Mr. Kazhegeldin. | 8   longer wished to assert any privilege over |
| 9           Do you know how Mr. Kazhegeldin got the | 9   approximately 20 documents which were held for |
| 10   documents? | 10   privilege from last Friday's production. |
| 11      A   You asked me already.  I said I don't | 11           Do you have any idea what those 20 |
| 12   know. | 12   documents are?  Do you have any knowledge about |
| 13           MR. SPERDUTO:  You're making me look | 13   this? |
| 14   slow again.  I'll -- I'll object -- | 14      A   No. |
| 15           THE WITNESS:  Sorry. | 15      Q   Okay. |
| 16           MR. SPERDUTO:  -- as asked and | 16           MR. SPERDUTO:  Excuse me.  Did you mark |
| 17   answered.  Thank you. | 17   this one?  Was it marked as 20? |
| 18        BY MR. COGAN: | 18           MR. COGAN:  Twenty, yeah. |
| 19      Q   We took a look at some communications | 19        BY MR. COGAN: |
| 20   that you had with Scott Horton in early to | 20      Q   Other than meeting with Mr. Sperduto |
| 21   mid-2013. | 21   and his -- lawyers from his firm, did you meet |
| 22           Do you recall that? | 22   with any other lawyers to prepare for this |
| 23      A   We discussed some, yes. | 23   deposition? |
| 24      Q   Have you had communications with | 24      A   No. |
| 25   Mr. Horton after that date? | 25      Q   Did you have any discussions with |
| **[Page 250]** | **[Page 252]** |
| 1      A   I -- I see him regularly. | 1   ECVK's lawyers? |
| 2      Q   Okay.  And did you have email | 2      A   (Witness shakes head.) |
| 3   communications with him through the latter part of | 3      Q   Okay. |
| 4   2013 and into 2014? | 4      A   No, I'm sorry.  I just  . . |
| 5      A   I might, yes. | 5           MR. COGAN:  Let me take a five-minute |
| 6      Q   Are you aware that Mr. Horton has some | 6   break  I may be done, |
| 7   sort of association with the law firm DLA Piper? | 7           THE VIDEOGRAPHER:  Going off record at |
| 8      A   I -- I know that he -- kind of he was | 8   4:33 p.m. |
| 9   with one firm and then moved to another firm.  He | 9           (Recess -- 4:33 p.m.) |
| 10   is of counsel in one of those firms in New York. | 10           (After recess -- 4:43 p.m.) |
| 11      Q   Okay.  Did you ever communicate with | 11           THE VIDEOGRAPHER:  We are back on the |
| 12   Mr. Horton on a DLA Piper email address to your | 12   record at 4:43 p.m. |
| 13   knowledge? | 13        BY MR. COGAN: |
| 14      A   I can't remember to be honest.  I never | 14      Q   Just a few more questions, |
| 15   kind of paid attention. | 15   Mr. Akhmetshin.  If you could turn back to your |
| 16           MR. COGAN:  Will you mark this, please? | 16   privilege log for a moment, page 27 of the |
| 17           (Akhmetshin Deposition Exhibit 20 was | 17   privilege log  If you could -- |
| 18   marked for identification and attached to the | 18           MR. SPERDUTO:  Here it is. |
| 19   transcript.) | 19        BY MR. COGAN: |
| 20        BY MR. COGAN: | 20      Q   Are you there? |
| 21      Q   Mr. Akhmetshin, I'm showing you a | 21      A   I'm here.  Page 27. |
| 22   document that's been marked Exhibit 20. | 22      Q   Item number 228, there's an email |
| 23      A   There's two of these; right? | 23   address consult.media@gmail.com. |
| 24      Q   Yes.  I'll get to the point. | 24           Do you see that? |
| 25           On page 2, Mr. Kauke -- | 25      A   Yes. |
| **[Page 251]** | **[Page 253]** |

**[64]  (Pages 250 to 253)**