# Exhibit 51

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE: | ) |
| | ) |
| | ) |
| APPLICATION OF INTERNATIONAL | ) |
| MINERAL RESOURCES B.V. FOR AN ORDER | )   1:14-MC-00340 |
| TO TAKE DISCOVERY PURSUANT TO 28 | )   JUDGE KESSLER |
| U.S.C. § 1782 | )   Assigned: April 3, 2014 |
| | )   Miscellaneous |
| | )   **Filed Under Seal** |
| Applicant. | ) |

### DECLARATION OF PATRICK P. SALISBURY

Pursuant to 28 U.S.C. § 1746, I, Patrick P. Salisbury, declare under penalty of perjury as follow:

      1.      I am senior partner of Salisbury & Ryan, LLP "(S&R")", a law firm based in New York, New York. I have been a member in good-standing of the Bars of the State of California since 1982, the State of New York 1993 and the District of Columbia since 1995 and am admitted to practice before the federal courts in several states.

**A.     Update on the Underlying Dispute- Swiss Arbitral Tribunal Validates ECVK's Fraud Claims**

      2.      I represent EuroChem Volga-Kaliy LLC ("ECVR") in its Swiss arbitration alleging fraud against Shaft Sinkers (Pty) Ltd. ("Shaft Sinkers"), a subsidiary of International Mineral Resources BV ("IMR") with IMR's representatives in control of the board at all relevant times. Just days ago, on August 24, 2015, the Swiss Arbitral Tribunal found in ECVK's favor and awarded ECVK  $112.6 million in damages plus $8 million in legal fees. In brief, the Tribunal found that Shaft Sinkers had made many fraudulent misrepresentations to ECVK to induce ECVK to award it a $350 million shaft sinking contract for ECVK's mining project and

had bribed ECVK's project manager whose job it was to oversee Shaft Sinkers' work and approve payments. The Tribunal also dismissed all counterclaims against ECVK.

3.     With the Swiss award, IMR's claim in the Dutch litigation with ECVK that no such fraud occurred has been proven false.

**B.     Mr. Akhmetshin's Engagement**

4.     One of the primary problems we faced as we prepared for the Dutch litigation to enforce the arbitration award we hoped to obtain against Shaft Sinkers, was that it was difficult to know exactly who the ultimate controlling parent of Shaft Sinkers was, and which individuals associated with the fraud conducted by Shaft Sinkers were also employed by or representing that parent company or affiliated entities such that they might be liable with Shaft Sinkers for such fraudulent conduct. Even after settling upon IMR as the proper primary defendant, it became important to gather evidence of these facts, and to understand where to look and how to develop further evidence to support that controlling relationship and liability for the fraud committed by Shaft Sinkers. I was aware that Shaft Sinkers' affiliates IMR and Eurasian Natural Resources Corporation ("ENRC) now existed and were controlled by the Trio of Kazakh oligarchs, and that ENRC had been the sole holding company before the IMR assets were transferred to a separate company, but the details, timing and circumstances of that split were not known by me, and it was important to understand this and to find out what roles certain individuals who had positions at Shaft Sinkers, ENRC and/or IMR played at each company in order to determine who the right defendants might be. When we fixed upon IMR as the primary defendant, which unlike ENRC is not a publicly-traded company, it also became important to learn whether IMR had sufficient assets to pay the large judgment we hoped for (and have now obtained) and where those assets were in the event we obtained a substantial judgment against Shaft Sinkers. Finally, I wanted to find out more about the individuals who were involved with these companies, in order to

understand where to look further for facts, evidence and other potentially liable parties. Obviously, as counsel to ECVK, we were duty-bound to conduct a pre-action investigation to assure that ECVK had a good-faith basis to bring fraud claims against the right parties. That is why Salisbury & Ryan hired Mr. Akhmetshin as a consulting expert to assist in this investigation.

5.     At the time of Mr. Akhmetshin's work for Salisbury and Ryan, I did not draw a conscious distinction between "categories" of the individual third parties that Mr. Akhmetshin was cultivating as sources of information. Mr. Akhmetshin generally described them to me, told me they were all already investigating the Trio and their businesses for their own reasons, would want information in exchange, and had information they might be willing to share in return. This last point was the key to our interests. Some of these third parties wrote articles or books about the Trio, some (like the Global Witness representative) wrote reports for a different audience, and some had their own disputes with the Trio.

6.     From the beginning of this proceeding, ECVK's instructions to Salisbury & Ryan as counsel have been clear:  protect available privileges, and avoid waiver. I have always thought this was the right course, especially in light of the inherent uncertainty about where any waiver would end.

**C.     This Proceeding**

7.     When IMR sought to compel production potentially of privileged documents from Mr. Akhmetshin in this proceeding, and in recognition of the fact that Salisbury & Ryan LLP has no office in Washington, D.C., I arranged for ECVK's retention of Latham & Watkins as local counsel to participate in these matters. I believe we first had contact with Edward Shapiro of Latham & Watkins, who has led that firm's work on this matter, in late March 2015. There was activity shortly thereafter, when counsel for Mr. Akhmetshin requested that we provide ECVK's

instructions about whether Mr. Akhmetshin should preserve available privileges at his upcoming deposition. In consultation with Mr. Shapiro, we decided that he would write to Mr. Akhmetshin's counsel to provide these instructions, which Mr. Shapiro did on April 6, 2015.

**D.     Privilege Analysis**

8.      In thinking about privilege issues and claims during the course of this matter, I was heavily influenced by having been involved in many of the underlying matters for several years. I was aware of what Mr. Akhmetshin and I had discussed at the time, what my instructions to him were, what he reported back to me (including information he had obtained from various sources), what documents Mr. Akhmetshin had received from his sources that in turn I had received from him, and what interaction I was able to have with potential sources of evidence because Mr. Akhmetshin was able to arrange introductions. I also knew that I had not received from or through Mr. Akhmetshin anything that appeared to have been "hacked" from IMR or improperly obtained. In addition, I knew that I had reported the substance of what I knew to co-counsel at Latham & Watkins, and that my co-counsel and I reconfirmed many of the relevant facts with Mr. Akhmetshin in extensive discussions with him personally and his counsel before reaching final judgment or conclusions.

9.      I also knew, in the period leading up to the filing of our opposition to IMR's Motion to Compel in this matter, that in many cases the facts explaining why particular documents should be protected by privilege were not apparent from the face of a particular document itself, but was also confident that based on what Mr. Akmetshin told me at the time and reconfirmed during the course of this proceeding that I believed I knew the facts that would help each such document meet that test. That is why I had the confidence to tell the Court, in my earlier declaration, that:

4

> I believe I know the source of every document on the Privilege Log based on information provided to me by Mr. Akhmetshin and none of these documents were obtained from IMR. Rather, all were obtained from identifiable third party sources outside IMR. Thus none were obtained by Mr. Akhmetshin through hacking, as IMR now claims.
>
> Should the Court decide that an *in camera* review of the privileged documents is required and that such review will not, itself, constitute any waiver of privilege, I will identify the sources of these documents to demonstrate my understanding that Mr. Akhmetshin obtained them through appropriate means and not through hacking.

Declaration of Patrick C. Salisbury of June 18, 2015, ECF 39-4 §§ 79-80. I believed that considerations of the very privilege we were asserting made it impossible to present those facts in our brief itself without risking general waiver of the privilege, which is part of the reason I made those statements offering to explain what I knew *in camera* to the Court so as to preserve privilege.

10.     While Mr. Akhmetshin was acting as Salisbury & Ryan's consultant, he provided me information on the telephone from time to time relating to the subject matter of that assignment. On some of these occasions, he told me which journalist or other source it had come from, and on some he did not. I remember generally from the discussions that Simon Goodley was one of the journalists Mr. Akhmetshin identified as a source from time to time.

11.     Mark Hollingsworth was another source identified by Mr. Akhmetshin. He was an experienced researcher and writer about Russian oligarchs and knew a great deal about the inner workings of the relationship between the members of the Trio. In particular, I learned from Mr. Akmetshin that he was familiar with the background of the organizations that might be considered the controlling parents of Shaft Sinkers and the individuals running such organizations, and therefore relevant as potential defendants or witnesses in the Dutch action. Mr. Hollingsworth was one of the most helpful sources of information that Mr. Akhmetshin developed. This was in part because he was knowledgeable in precisely the area of greatest

interest to me.  Because Mr. Hollingsworth had so much information about how the Trio and its entities conducted business, I understood (and later confirmed) that he would understand how particular individuals who had acted for Shaft Sinkers (including Amre Youness who acted as both the chairman of Shaft Sinkers, the CEO of IMR and who now works for ENRC, whose name appears in Privilege Log Document 205) were also associated with affiliates (most importantly, as it turned out, IMR) and what their business practices were.  I believed from information that Mr. Akhmetshin told me he had learned from Mr. Hollingsworth, and from Mr. Hollingsworth's reputation, that he would be a valuable source of insight into these matters.

12.     Mr. Hollingsworth's contribution began with information he supplied to Mr. Akhmetshin and that Mr. Akhmetshin told me.  Later, Mr. Akhmetshin was able, through his relationship with Mr. Hollingsworth, to arrange a meeting with Mr. Hollingsworth for me (through Mr. Akhmetshin did not attend).  I met with Mr. Hollingsworth at the Carlton Tower Hotel in London on April 27, 2013 for several hours.  I did a significant amount of work to prepare for the meeting, including discussing with Mr. Akhmetshin the information that Mr. Hollingsworth had already supplied to him or written about previously.  In the meeting, we discussed the IMR/ENRC history and corporate structure, leads that I might pursue and (very importantly) the role that different individuals, including Mr. Youness, played at different companies within the Trio's organization.  The meeting was a valuable source of information in our continuing case preparation.

13.     I have never met the former Prime Minister of Kazakhstan, Mr. Kazhegeldin.  I know of him through Mr. Akhmetshin who explained that Mr. Kazhegeldin had extensive dealings with the Trio both while Prime Minister of Kazakhstan and in connection with legal actions in which he was involved with the Trio or their companies.  Mr. Akhmetshin told me that

he had long worked as a consultant for Mr. Kazhegeldin who was his largest client and with whom he maintained a close relationship. From the very beginning of our work with Mr. Akhmetshin, I observed that he (Mr. Akhmetshin) already knew a great deal about the Trio and their business dealings. Mr. Akhmetshin explained that he was so familiar with the Trio because he was working with another client—Mr. Kazhegeldin—who had collected a great deal of information about the Trio and their business dealings because he or some affiliate was in litigation with the Trio or related companies or individuals. He indicated that Mr. Kazhegeldin had collected so much information about the Trio and related entities that he had a searchable database of documents concerning the Trio. I accordingly asked Mr. Akhmetshin if he could learn more from this database, and suggested categories of information for which Mr. Kazhegeldin's associates could search for evidence which would be relevant to our litigation.

14.     It is my understanding that Mr. Akhmetshin worked with Mr. Kazhegeldin and his office for a number of months to review and collect information from their files. I knew, because Mr. Akhmetshin told me, when I received them that each of the communications identified in the Court's Opinion concerning the crime-fraud exception (Privilege Log Documents 54, 57, 66-67, 70 and 118-24) related to this evidence gathering project with Mr. Kazhegeldin. I knew this because Mr. Akhmetshin had told me about the project in conversations around the same time period, because the substance of the emails matched the timing and substance of the Kazhegeldin project, because I was not aware of anything else it might relate to and because I understood Mr. Kazhegeldin's sensitivity to being identified in writing with any of the efforts he was making to assist us against the interests of the Trio. (I understood that as former prime minister of his country, living in exile, Mr. Kazhegeldin might have many reasons to be as private as possible about his activities, and Mr. Akhmetshin had told

7

me that was the case and that he would be careful about what he put in writing about Mr. Kazhegeldin.) I took additional comfort from Mr. Akhmetshin's reconfirmation to me and co-counsel that my understanding was correct, in our meeting in Washington in early June 2015.

15.     I therefore believed I knew, and still believe I know, that none of these documents reference any information obtained from "hacking" IMR or through any other improper means. Though I believed I was impeded by requirements of the privilege we were asserting from identifying the details of this knowledge to the Court before now, Mr. Akhmetshin and I were able to share this information with co-counsel in the period leading up to the filing of our brief in opposition to the motion to compel in this proceeding.

16.     Mr. Akhmetshin's counsel never supplied to us for review the documents on his privilege log that he claimed were protected by Mr. Akhmetshin's own attorney/client privilege (that is, that were unrelated to ECVK). Accordingly, we never reviewed Privilege Log Documents 207, 217-22, 224-25 or 228-32, and ECVK made no claim of privilege with respect to any of these documents.

17.     I wrote the email that is identified as Privilege Log Document 76 on Mr. Akhmetshin. My reference to the "PR campaign we have been discussing" was not to any active effort, but instead to the proposal that Mr. Akhmetshin was about to make to ECVK in Moscow. Since I had already discussed that topic not only with Mr. Akhmetshin, but also with Mr. Sidnev the recipient of the email, and the general counsel of ECVK's corporate parent, I felt certain Mr. Sidnev would understand what I meant. The other references, to Mr. Akhmetshin's thoughts about a PR campaign (particularly Mr. Akhmetshin's "thoughts as to how we should proceed and can help"), related to the pitch he was preparing to make to ECVK. As I have explained before,

8

Mr. Akhmetshin's proposal was declined by ECVK the very day it was made. See my
Declaration dated June 18, 2015 ¶ 66.

18.     I received Privilege Log Document 163 from Mr. Akhmetshin by email on
February 6, 2013. Prior to sending his email, Mr. Akmetshin had called me and told me he was
obtaining information from Simon Goodley and, in exchange, wanted to provide a copy of our
complaint once it was filed in the Netherlands. I agreed he could provide the complaint <u>after</u> it
was filed and made publicly available in order to obtain more information from Mr. Goodley,
who was extensively involved in his own research of the Trio, IMR and ENRC. I did not place
very much significance on the wording of Mr. Akhmetshin's request to "pls send me your filings
once they are ready and I will work on getting the story out," because the Dutch case filing was
not ready or even nearly ready at that time. In any event, I expressly told Mr. Akhmetshin that
he should provide the Dutch complaint when filed only to those sources whom he thought could
provide information in return, and only if he expected that by doing this favor he would have a
reasonable chance to get such information. He told me that the complaint we would ultimately
file in the Netherlands was a useful piece of information to trade that was likely to enhance his
standing with his sources and his ability to deliver more information to us. I think that proved
true as some of the most valuable information we received took place after he had provided the
complaint to his sources. Privilege Log Document 205 shows this timing.

19.     I sent Privilege Log Document 254 to Mr. Akhmetshin to document the
conclusion of our consulting relationship. I included the instructions to refer any press inquiries
he might receive to EuroChem's press relations department because I wanted to be sure that if
any of his contacts thought he was still working for ECVK, he made it clear to them that he was
not (as EuroChem had instructed). I had no concern that Mr. Akhmetshin was providing

information concerning ECVK to his press or other sources, but I want to ensure that any

exchange of information that was on-going stop.


I declare under penalty of perjury under the laws of the United States that the foregoing is true

and correct.


Dated: September 1, 2015
New York, NY


Patrick P. Salisbury